1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3

      ForteCEO Services, Inc.,
4     d/b/a ForteONE,
5          Plaintiff,
6        vs.                        No. 1:11-CV-05179
7     Terra Contracting, LLC;
      Terra Abatement Services, LLC;
8     Terra I/S, LLC; and Down Under
      Municipal Services LLC,
9

           Defendants.
10                                       /
11
12              The discovery deposition of
13    JEFFREY T. CONRAD, CPA, JD, Volume II, taken in the
14    above-entitled case, on the 29th day of August, 2013, at
15    12:00 o'clock p.m. at the Tetzlaff Law Offices, 11 South
16    LaSalle Street, Suite 400, Chicago, Illinois, pursuant
17    to agreement of counsel.
18
19    Reported by:  Karyn H. Chalem, RPR, CSR
      License No.:  084-004167
20
21
22
23
24

EXHIBIT L

```
 1    A P P E A R A N C E S
 2            O'HALLORAN, KOSOFF, GEITNER & COOK
              650 Dundee Road
 3            Fourth Floor
              Chicago, Illinois  60062
 4            BY:  JEFFREY R. ROSENBERG
              (847) 291-0200
 5            jrosenberg@okgc.com
                  On behalf of the Plaintiff;
 6
              TETZLAFF LAW OFFICES
 7            11 South LaSalle Street
              Suite 400
 8            Chicago, Illinois  60603
              BY:  JAMES D. BENAK
 9            (312) 574-1000
              jbenak@tetzlafflegal.com
10                On behalf of the Defendants.
11
   Also Present:
12
              MATTHEW IODICE
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT L

```
1                    I N D E X
2    WITNESS:                          PAGE:
3    JEFFREY T. CONRAD, CPA, JD
4       Examination by Mr. Benak          4
5
     EXHIBITS:
6
        5    Report dated August 22, 2013      5
7
        6    Report dated April 5, 2013        6
8
        7    Agreement between
9            ForteONE and Terra               8
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**EXHIBIT L**

1          (Witness sworn.)

2               JEFFREY T. CONRAD, CPA, JD,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5               THE WITNESS:  I do.

6                         EXAMINATION

7    BY MR. BENAK:

8        Q.  Good morning, Mr. Conrad.

9        A.  Good morning.

10       Q.  We've met before, correct?

11       A.  That's correct.

12       Q.  This is a, as a practical matter, a

13   continuation of your deposition that we took some

14   time ago in this case and -- but for the record, to

15   make sure that we're -- we've got everything tied

16   down here, would you please spell your name, state

17   and spell your name.

18       A.  It's Jeffrey, J-E-F-F-R-E-Y, middle initial

19   is T, Conrad, C-O-N-R-A-D.

20       Q.  And, Mr. Conrad, we've been over kind of the

21   fundamentals of taking a deposition.  You recall

22   all of those?

23       A.  Yes, I do.

24       Q.  I'm going to ask you questions and you give

1  me an answer.  If I'm unclear at any time, just ask

2  me to clarify, and we'll make sure we understand

3  each other so that we can get a good question and a

4  good response.

5      A.  Understood.

6          MR. BENAK:  Can you mark this 1,

7  please.

8          (Exhibit 1 marked.)

9  BY MR. BENAK:

10     Q.  Mr. Conrad, the court reporter has just

11 handed you what's been marked as Deposition Exhibit

12 Number 1.  Would you --

13         MR. ROSENBERG:  Jim, do you want to

14 make it Deposition Exhibit Number 5 because I

15 believe you used 4 in the last one?

16         MR. BENAK:  That's fine, Deposition

17 Exhibit Number 5.  Can you change the designation,

18 please?

19         MR. ROSENBERG:  And that's up to you.

20 It was just a suggestion.

21         MR. BENAK:  No, that's fine.  That will

22 keep everything straight.

23         (Exhibit 5 marked.)

24 /////

EXHIBIT L

1    BY MR. BENAK:

2        Q.  Now looking at Deposition Exhibit Number 5,

3    Mr. Conrad, can you tell me what that is.

4        A.  This is my revision to the April 5, 2013

5    expert witness report, and it's dated August the

6    22nd, 2013.

7        Q.  It's a revision to your report, correct?

8        A.  That is correct.

9        Q.  Okay.  Now, take a look at it real -- just

10   closely and make sure this is true and accurate and

11   complete.

12       A.  Yes.

13       Q.  Is it a true, accurate and complete copy?

14       A.  Yes.

15           MR. BENAK:  Okay.  So that we have a

16   complete record here, let's put your previous

17   opinion of April 5th into the record, if you'd

18   please mark that as Number 6.

19           (Exhibit 6 marked.)

20           MR. BENAK:  Off the record for just a

21   second.

22           (Off record discussion.)

23           MR. BENAK:  Back on the record.

24   Thanks.

1    BY MR. BENAK:

2        Q.  Mr. Conrad, you've been handed what's been

3    marked by the court reporter as Deposition Exhibit

4    Number 6.  Could you identify that, please?

5        A.  This is the expert witness -- my expert

6    witness report dated April 5 of 2013.

7        Q.  Is that a true, accurate and complete copy

8    of your report?

9        A.  Yes, it is.

10       Q.  Okay.  Now, in connection with the opinions

11   that you have given in this -- in your first

12   report, the April 5th report -- and let's make sure

13   we have some semantics down.  I'll refer to your

14   April 5th report as either the April 5th report or

15   your first report, and I'll refer to the April 22nd

16   report as the April 22nd report or your second

17   report.  Is that fair?

18       A.  August 22nd report, yes, I understand.

19       Q.  August, I'm sorry, August 22 as your second

20   report.  Is that fair?

21       A.  Yes.

22       Q.  We'll understand each other if I use those

23   terms?

24       A.  Uh-huh.

1     Q. Okay. This particular -- your April 5th

2     report was a report on -- or opinion on an

3     agreement between ForteONE and Terra, correct?

4     A. Yes.

5            MR. BENAK: Okay. Just to make sure

6     that we've got a complete record, I'd like to put

7     that agreement in the record as well, so if you

8     could mark that, please.

9            (Exhibit 7 marked.)

10    BY MR. BENAK:

11     Q. Mr. Conrad, the court reporter has handed

12    you what's been marked as Deposition Exhibit Number

13    7, and I'd ask you to take a look at that and

14    identify it for me, please.

15     A. This is the May 7, 2010 agreement between

16    ForteONE and Terra Contracting.

17     Q. And that's the agreement to which your first

18    and second reports relate?

19     A. Yes, it is.

20     Q. Now I'd like you to take a look at your

21    first report, the April 5th report, which is

22    Deposition Exhibit Number 7. Is that right?

23     A. 6.

24     Q. 6. And in your first report, you give an

1    opinion on the calculation of the fees due under

2    the agreement between the parties, which is

3    Deposition Exhibit Number 7, is that correct?

4        A.  Could you repeat the question, please?

5        Q.  Sure.  In your April 5th report, you give an

6    opinion on the fees that are due under the May 7th

7    agreement, which is Deposition Exhibit Number 7,

8    correct?

9        A.  That is correct.

10       Q.  Okay.  And if you go to page two of your

11   first report, your opinion on the fees is set out

12   at the bottom of page two and then it carries on to

13   page three, and those include the annual

14   performance fee and the sale incentive fee, is that

15   correct?

16       A.  No, I don't follow you there.

17              MR. ROSENBERG:  You might just want to

18   clarify that we're just going to ask a few

19   background questions about the first report.

20              MR. BENAK:  These are foundational,

21   Counsel.

22              MR. ROSENBERG:  Okay.

23              MR. BENAK:  Okay.

24              THE WITNESS:  Page two?

**EXHIBIT L**

1          MR. BENAK:  Yes, page two of your April

2     5th report.

3          THE WITNESS:  All right.

4     BY MR. BENAK:

5     Q.  You recite the basis of your opinion on the

6     annual performance fee and the sale incentive fee.

7     Do you see where I'm directing you?

8     A.  I cover the basis for the opinion.  I don't

9     have the calculations on that page.

10     Q.  Understood.  And this is the -- the formula

11     on which you base your opinion as to the amount due

12     under the agreement, is that correct?

13     A.  Yes, it is.

14     Q.  Now, as I understand your testimony in your

15     previous deposition, which we took on May 16th,

16     2013, your calculation of the annual performance

17     fee and the sale incentive fee and the formula for

18     that calculation is taken from pages seven and

19     eight of the agreement.  Is that correct?

20     A.  That is correct.

21     Q.  Okay.  And as you testified at your first

22     deposition on May 16th, your testimony was that you

23     had not looked beyond the formula on pages seven

24     and eight to determine your opinion on the amounts

**EXHIBIT L**

1    due under the agreement, correct?

2        A.   That is correct.

3        Q.   Okay.  And you also testified that you did

4    not consult with any of the principals to the

5    agreement, nor did you read any of the depositions

6    of the principals to the agreement prior to coming

7    to your opinion, correct?

8        A.   I don't recall saying that.

9        Q.   Okay.  Well, I'll just ask you the question

10   outright.  We may not have to go back to your

11   deposition.

12       Did you, prior to making your first opinion,

13   consult any of the principals to the agreement or

14   read any of their depositions?

15       A.   I don't believe that I had read a deposition.

16   Again, I'm going back to prior to the first report,

17   the first deposition, that there had been some

18   consultation, just general discussion.

19       Q.   Uh-huh.

20       A.   That's all I can recall.

21       Q.   Okay.  Did you talk with Mr. Rittmanic or

22   Mr. Marshall about the intent of the agreement

23   prior to coming to your first -- or arriving at

24   your first opinion?

1    A.  About the intent?  I'm not sure I understand

2  what you mean by intent of the agreement.

3    Q.  Well, did you ask them about what they were

4  trying to accomplish in the agreement -- let me

5  back up.

6        First, did you talk to them about the

7  agreement prior to arriving at your first opinion?

8    A.  I recall maybe one telephone discussion with

9  Dave Marshall regarding specific items in the

10  analysis.

11    Q.  Did you ask them specifically about the

12  intent of the agreement?

13        MR. ROSENBERG:  Object to the form.

14        THE WITNESS:  Not that I recall.

15  BY MR. BENAK:

16    Q.  Okay.  Did you ask them about their

17  understanding of the agreement?

18    A.  Not that I recall.

19    Q.  As I recall your deposition testimony on May

20  16th, you confined your analysis to the formula on

21  pages seven and eight to arrive at your opinion

22  without consulting other parts of the agreement.

23  Is that correct?

24    A.  I'm not sure I understand your question.

**EXHIBIT L**

1    Q.  Well, did you think, in arriving at your

2    first opinion in this case, that it was necessary

3    for you to look at any other parts of the agreement

4    other than the formulas on pages seven and eight to

5    arrive at your opinion?

6    A.  Yes.  Well, to calculate the -- I want to

7    make sure I get the terminology correct.

8        To calculate the annual performance fee and

9    the sale incentive fee, I used the formulas on page

10   seven and eight of the agreement.  As far as the --

11   I believe the interest calculated -- calculation is

12   based on a provision further back in the agreement,

13   but -- so I used page seven and eight to calculate

14   the fees.

15   Q.  Did you -- as I recall your deposition on

16   May 16th, you didn't consult any other parts of the

17   agreement to inform your decision or opinion on the

18   amounts due under the agreement.  Is that correct?

19   A.  Well, there's -- other than any kind of

20   general definition section, I don't recall any right

21   offhand.

22   Q.  Well, is it your testimony that prior to

23   arriving at your first opinion that you consulted

24   the definition section of the agreement?

1      A.  Prior to formulating my -- the April 5

2   report, I read the entire agreement.  The

3   calculations of the fees are based on the formulas

4   on page seven and eight.

5      Q.  Now, in -- take a look at your August 22

6   opinion, which is your second report in this case,

7   which is Exhibit 5.

8      A.  Are we -- could I ask a question?  Are we

9   referring to it as a second report or a revision?

10     Q.  I can call it whatever you want, Mr. Conrad.

11              MR. ROSENBERG:  I believe you said --

12              MR. BENAK:  I was going to call it the

13   second report.  I thought that's how we referred to

14   it.

15              MR. ROSENBERG:  Well, it is

16   technically, I believe, titled revised report, but

17   you can call it by its date.  How about that?

18              MR. BENAK:  We'll just call it the

19   August 22 report.  How's that?

20              THE WITNESS:  All right.

21   BY MR. BENAK:

22     Q.  Okay.  So if you'll take a look at the

23   August 22 report, which is Exhibit 5, and look at

24   page one, and as I -- well, just direct your

1   attention to that part of page one which pertains

2   to Down Under Municipal Service.  Do you see that

3   on page one, in the middle of the page?

4     A.  Yes.

5     Q.  Okay.  Now, you've revised your first

6   opinion to account for Down Under Municipal

7   Services revenues, as I understand your opinion, in

8   calendar year 2009.  Is that correct?

9     A.  No.

10     Q.  Okay.  Tell me what's correct, then.  Tell

11  me what you did.

12     A.  The report, the April 5 report, is revised

13  for the calculation of Down Under Municipal Services

14  EBITDA as it relates to the 2009 and the 2010

15  calendar year.

16     Q.  Okay.  And how is it revised?

17     A.  The EBITDA calculation, which is stated

18  separately in schedule six, I'll just reference in

19  there that 2008 is just a -- it's a point of

20  reference.  It really isn't used in the

21  calculations.  The schedule six calculates Down

22  Under EBITDA for 2009 and 2010 separately, and then

23  that is brought forward to the EBITDA schedule

24  three, and you will note that it's separate -- the

1    Down Under EBITDA is separately stated and included

2    in the 2009 and 2010 combined entity EBITDA

3    calculation.

4        Q.  Okay.  And why did you find it necessary to

5    do that?

6            Let me -- before you answer that, let me

7    break that question up a little bit.

8        A.  Sure.

9        Q.  What effect does that change have on your

10   opinion?

11       A.  It does not -- the calculation change has no

12   impact on the sale incentive fee.  The annual

13   performance fee is adjusted by some small

14   percentage.  I don't have the numbers right in front

15   of me to compare them, but the total annual

16   performance incentive fee for 2010, '11 and '12 is

17   reduced by a small amount.

18       Q.  Okay.  And what impact did your change have

19   on your calculation of EBITDA for those years?

20       A.  Well, the Down Under EBITDA was included in

21   the combined entity EBITDA.

22       Q.  And so what does that do for your

23   calculation of EBITDA -- EBITDA year over year as

24   it relates to the performance incentive?

1      MR. ROSENBERG:  I object, compound.

2  BY MR. BENAK:

3      Q.  Do you know what I'm saying?

4      A.  No, I don't.

5      Q.  Okay.  What I'm asking you is what impact

6  your change had on the comparison of EBITDA year

7  over year.

8           MR. ROSENBERG:  Same objection.

9           THE WITNESS:  Well, there's another

10  entity included in EBITDA, so it increased EBITDA

11  for both years.

12  BY MR. BENAK:

13      Q.  So it increased EBITDA for the first -- for

14  the first year, the base year, 2009, if you will,

15  is that correct?

16      A.  Yes, it did.

17      Q.  And it also increased it, then, for 2010?

18      A.  Correct.

19      Q.  And the overall impact is to reduce the

20  difference between those two years, is that

21  correct, in EBITDA?

22      A.  I don't -- I still don't follow your

23  question.

24      Q.  Well, as compared with your first report,

**EXHIBIT L**

1    the change in EBITDA from 2009 to 2010 is reduced,

2    correct?

3        A.  No, actually it's increased.

4        Q.  Okay.  And tell me how that impacts, then,

5    the sale incentive, because I'm not following what

6    you just told me.

7             MR. ROSENBERG:  I think you

8    mischaracterized his testimony.  I believe he

9    testified it doesn't impact the sale incentive.

10            THE WITNESS:  I've already stated it

11   does not impact the sale incentive.

12            MR. BENAK:  Did I say sale incentive?

13   I meant performance incentive on this.

14            THE WITNESS:  The performance incentive

15   fee, as we've already covered, is based on 2009 as

16   a base year.

17            MR. BENAK:  Correct.

18            THE WITNESS:  The change from 2009 to

19   2010 actually increased, not decreased, because the

20   EBITDA increase for Down Under was $370,000 in 2009

21   and it was $431,000 in 2010.

22   BY MR. BENAK:

23       Q.  Now, did you include the Down Under

24   calculation in your, for 2010, in your first

1    report?

2         In other words, in your first report, was

3    Down Under included in your 2010 EBITDA comparison?

4         A.  Well, no.  That's why the revised report was

5    written.

6         Q.  So let me then ask the question I was asking

7    a little bit ago, and that is:  Why did you think

8    that it was important to make this change?

9         A.  Based -- after reading Mr. Fox's expert

10   report and attempting to reconcile some of the

11   calculations in his report and also after

12   consultation with counsel and with Dave Marshall, it

13   was my understanding that Down Under was one of the

14   entities that was covered under the May 7, 2010

15   agreement and should have been included in the

16   overall -- in the base year calculation as well as

17   the subsequent year calculations.

18        Q.  Okay.  And so you informed your opinion by

19   talking with Mr. Marshall about which companies

20   should have been included?

21        A.  Correct.

22        Q.  Okay.  And then you also looked at the

23   agreement, as I understand your opinion, at the

24   definition section, which is page 11 of 15, is that

1 correct? Take a look at Exhibit 7, Mr. Conrad.

2     A. That is correct.

3     Q. Okay. And what part of the definitions did

4 you consult to inform your opinion?

5     A. The provision that I believe would be

6 applicable there would be the definition of -- the

7 second definition, which is "client," in quotes.

8     Q. Okay. And your information from

9 Mr. Rittmanic and your reading of the definition

10 section leads you to conclude that Down Under

11 should have been included in the base year as well

12 as the 2010 comparison year for purposes of the

13 performance incentive?

14     MR. ROSENBERG: Jim, I'm sorry, you

15 said Mr. Rittmanic. He said he talked to

16 Mr. Marshall.

17     MR. BENAK: Mr. Marshall, excuse me.

18 BY MR. BENAK:

19     Q. Do you understand my question or do you want

20 me to ask it again?

21     A. Why don't you try it again.

22     Q. Okay. So you talked with Mr. Marshall to

23 inform your opinion and you also consulted the

24 agreement at Section 1.1, "client," to inform your

1   opinion as to who or what entities were to be

2   included in the 2009 base year and in the 2010

3   comparison year, is that correct?

4      A.  Well, it was not just limited to the 2010

5   comparison year.  My question to Mr. Marshall was,

6   is Down Under, as you understood it, an associated

7   company under the -- under the definition of

8   "client," as he understood it, under 1.1.

9      Q.  And he told you it was, as he understood it,

10  to be a company included in "client"?

11     A.  And I -- and I would classify it as

12  associated because it didn't follow under subsidiary

13  and it wasn't a part of a consolidated group in a

14  financial reporting sense.

15     Q.  But you were satisfied, after having

16  discussed with Mr. Marshall his intent and after

17  having read the definition of "client," that Down

18  Under should be included in the calculation

19  starting in base year 2009?

20     A.  Yes.

21     Q.  Okay.  Now, what -- what effect does that

22  have on the -- or let me ask it a different way.

23         How does your new definition of "client" and

24  your new calculations using Down Under -- or

1  including Down Under in the calculations reflect on

2  the performance of the combined companies?

3          MR. ROSENBERG:  Object to the form.

4  BY MR. BENAK:

5      Q.  In your opinion.

6      A.  Well, it increases the base year performance

7  and it increases the performance for each year after

8  that.

9      Q.  Let me ask the question a little bit

10  differently.  Did you think it was important to

11  include Down Under in your calculations to properly

12  reflect what the client -- what the performance of

13  the client, as defined in this agreement, was over

14  that period of time?

15          MR. ROSENBERG:  Object to the form.

16          THE WITNESS:  I felt it was appropriate

17  to include Down Under in the EBITDA calculation.

18  BY MR. BENAK:

19      Q.  Okay.  In your view, does that more properly

20  reflect what the, quote, client did over that

21  period of time?

22      A.  It properly reflects the agreement --

23      Q.  Does it --

24      A.  -- between the parties.

1    Q.  Does it more properly reflect the agreement

2    than your original opinion?

3    A.  Yes, it does.

4    Q.  Let's take a look at page two of your August

5    22 report, Mr. Conrad, and what I'd like you to

6    focus on is the fourth complete paragraph on page

7    two.  And what you've said in the middle of that

8    paragraph, let me just read it into the record:

9    Our interpretation of the agreement is that the

10   EBITDA and fee calculations are to be made based on

11   the financial statements without exception, and any

12   adjustments to those financial statements, paren,

13   other than those provided for in the agreement,

14   closed paren, are limited to incorrect accounting

15   statements, paren, i.e., incorrect accounting for

16   deferred compensation, excess legal accruals,

17   inconsistent audit and tax accruals, and excess

18   insurance accruals, closed paren, not corrected

19   under audit or review as set forth in schedule

20   three.

21        Did I read that correctly?

22   A.  Yes, you did.

23   Q.  Okay.  Now what I'd like to focus on are a

24   couple of things.  First, you've referred to

1 incorrect accounting treatments. What do you mean

2 by that?

3     A. Transactions that were reported incorrectly

4 in the financial statements under generally-accepted

5 accounting principles.

6     Q. And so is it your opinion that the things

7 that you've corrected, i.e., those things that

8 you've set out, deferred comp, excess legal

9 accruals, inconsistent audit and tax accruals, were

10 incorrectly recorded in the financials of the

11 company?

12     A. Yes, that is our opinion.

13     Q. And so it's your opinion that the audited

14 financials that were provided for those two years

15 were wrong in the respects that you've stated in

16 this letter?

17     A. Yes. The audited financial statements were

18 incorrect as to those -- as to the treatment of

19 those issues.

20     Q. Okay. And is that simply a difference of

21 opinion between you and the auditors?

22           MR. ROSENBERG: Object to the form.

23           THE WITNESS: I'm not sure I understand

24 your question.

1    BY MR. BENAK:

2       Q.  Well, I mean, what's the basis for your

3    statement that they're incorrect is what I'm asking

4    you.

5       A.  Well, which one?

6       Q.  Any of them.  Why don't we focus on the

7    excess legal accrual.

8               MR. ROSENBERG:  I'll object.  This was

9    reviewed in the first deposition, but...

10              MR. BENAK:  He's restated it here and I

11   think it's fair and I'm going to go into it.  It

12   won't be long, Mr. Rosenberg.

13              THE WITNESS:  The -- the excess legal

14   accrual is based on the -- our analysis of

15   financial statements and comparing one year to the

16   next and determining whether it's appropriate under

17   generally-accepted accounting principles to accrue

18   an expense and accelerate an accrual of an expense

19   into one year where you had not done so previously.

20   We've concluded that that was incorrect.

21              Now, there's a different -- we're using

22   a different standard there, is it correct

23   accounting or not.  You have to understand that

24   auditors use a different standard.  Auditors may

1 look at a financial statement and say, yes, there

2 is an incorrect accounting treatment on this

3 statement; however, we do not believe that

4 materially impacts the statements as a whole and we

5 don't think that it would change the conclusion of

6 the reader of the audited financial statements,

7 readers being those that are reading it for a

8 different purpose, therefore they pass on making

9 the adjustment.

10    So when you look at audited financial

11 statements, are there incorrect accounting methods,

12 are there incorrect accounting conventions, yes,

13 there are.  They are not necessarily changed.

14 BY MR. BENAK:

15  Q.  Okay.  And where in the agreement, which is

16 Exhibit Number 7, do you find an instruction to

17 change the audited financial statements to comport

18 with your understanding of appropriate GAP?

19  A.  There's no reference to it there.

20  Q.  So you took the liberty of adjusting it,

21 knowing, however, that the agreement just specified

22 audited financial statements?

23  A.  Well, the agreement actually -- let's go back

24 to the agreement.

1    The reference would be on page seven, and

2    it's simply under the incentive formula at the

3    bottom of the page, marked paragraph number one,

4    simply refers to as computed using audited

5    consolidated financing statements.

6    Q.  Correct.

7    A.  The changes that we are suggesting, first

8    off, they do not simply -- in some cases, they

9    remove expenses.  In other case, we simply adjusted

10   an expense downward to properly reflect the timing

11   of the expense.  That's -- those are the adjustments

12   that we're making to properly reflect the

13   accounting, the financial statements.

14   Q.  And what I'm asking you is:  Where in the

15   agreement do you find the authority to make

16   adjustments like that?

17   A.  It does not state that on page seven or

18   eight.

19   Q.  And you're making these adjustments, as you

20   say, to properly reflect the accounting for the

21   company?

22   A.  That is correct.

23   Q.  And to properly reflect the financial

24   performance of the company?

**EXHIBIT L**

1    A.  We are making the change to properly reflect

2    the financial statements.

3    Q.  Okay.  Which, if I may say, are designed to

4    reflect the financial performance of the company?

5    A.  Well, I'd have to understand what you mean by

6    "financial performance."

7    Q.  Well, what's the purpose of financial

8    statements?

9    A.  Can be many purposes to financial statements.

10    Q.  Well, is a financial statement designed to

11    give a correct or incorrect representation of the

12    financial performance of the company?

13    A.  The financial statements are designed to

14    provide one with information so that the reader can

15    draw their own conclusions about financial

16    performance.

17    Q.  And those financial statements are designed

18    to be accurate and complete and true and correct,

19    is that right?

20    A.  As I stated earlier, those financial

21    statements are designed to be accurate and not

22    materially misstated.

23    Q.  I want to go back to the legal accrual and

24    your statement that you were trying to, as I

**EXHIBIT L**

1    understand your testimony and correct me if I'm

2    wrong, properly reflect the period in which the

3    legal expenses were incurred.  Is that correct?

4        A.  Correct.

5        Q.  Okay.  And as I recall your first report --

6    well, why don't we just look at it.  Can you please

7    pull out your first report, your April 5 report,

8    and show me where you've treated the legal -- what

9    you now call the incorrect legal expense.

10       A.  I believe we're on schedule three of -- page

11   ten, schedule three --

12       Q.  Okay.

13       A.  -- which is the only schedule on the page,

14   and it's -- the legal accrual is item -- it's the

15   second modification and there's a footnote related

16   to it, item D.

17       Q.  Okay.  And the add back for item D is

18   $150,000?

19       A.  The add back for item D is $150,000 in

20   calendar year 2010; in trailing 12, 2-28-2011, it's

21   $150,000; and then for 2011, it's actually a

22   separate item, which is 200,000.

23       Q.  So what's the total legal accrual that

24   you've accounted for there?

1     A.  I'm not sure I can answer that question

2  because there's three time periods you're referring

3  to.

4     Q.  Okay.  Let me ask it a different way, then.

5  What in the financial statements as provided to you

6  indicated that there should be $150,000 added back

7  to the 2010 financials?

8     A.  I'd have to see the financial statements.  I

9  don't recall right offhand.

10    Q.  Do you recall whether or not there was a

11  specific expense item that was shown as paid and

12  then not accounted for?

13    A.  Well, we're a little bit off track if you're

14  referring to an expense item that is paid.  This

15  would actually be picked up on a -- on the financial

16  statement balance sheet under either current or

17  long-term debt because it would have been accrued as

18  a debt, but yet it would not have been paid yet.

19    Q.  I guess what I'm asking was:  What's the

20  basis for your conclusion that $150,000 in legal

21  expenses should be added back to the 2010 financial

22  statements?

23    A.  It was information related to the financial

24  statements, but without those financial statements

1   in front of me, I can't really answer that question.

2       Q.  Okay.  As you sit here today, do you recall

3   whether or not that expenditure was actually made

4   in 2010?

5       A.  Well, again, it -- the expenditure was not

6   made.  It was picked up as an accrued liability.  If

7   you accrue a liability on financial statements, that

8   means it was not actually paid yet.  So it's not an

9   expenditure.

10      Q.  Okay.  And is it your understanding that

11  there was an accrual that you saw for 2010 that was

12  not reflected otherwise in the financials?

13          I'm trying to understand, Mr. Conrad, just

14  so we can kind of cut to the chase, what the basis

15  was originally for your inclusion of $150,000 add

16  back EBITDA in 2010 for legal accrual.

17      A.  I'm going to need to see the financial

18  statements to answer that.

19      Q.  Can you tell from reference to your letter,

20  your original, your April 5th?

21      A.  I'm reading the footnote below and --

22      Q.  Would you, please.

23      A.  The footnote below item number D refers to

24  that -- refers to there being an accrual of legal

1  expense in the financial statements, so that means

2  that it was an expense included in 2010 and it was

3  a -- in calendar year 2010 and it was an item that

4  was included in the income statement, but it was

5  reflected as a liability because it had not been

6  paid yet.

7      Q.  And the $150,000 for 2011, where did that

8  come from?

9      A.  Well, the $150,000 on the trailing 20 -- on

10  the trailing 2-28-11 is the same amount that's

11  included on the 2010, because the 2010 would have

12  been a year-end accrual at 12-31-10, which would

13  have been in the trailing 12-month 2011.

14      Q.  Okay.  I'd like to go back to something we

15  just covered a moment ago.  Now, you've said at

16  footnote D:  Per information provided to us, an

17  accrual was made on 12-31-10 regarding litigation

18  matters without the requisite conditions of a high

19  probability that a liability has been incurred and

20  the ability to reasonably estimate the amount of

21  the loss.

22          In lay language, Mr. Conrad, what does that

23  mean?

24      A.  The -- the -- the provision -- the part of

1    the footnote that says condition of high

2    probability -- of a high probability that a

3    liability has been incurred and the ability to

4    reasonably estimate the amount of the loss is the

5    generally-accepted accounting principles standard

6    for accruing a liability as an expense -- and an

7    expense even before that expense has been paid.

8        Q.   Okay.  And it's your opinion that that

9    prerequisite was not made prior to taking the

10   150,000 dollar accrual?

11       A.   That is correct.

12       Q.   And so for 2010, you added that $150,000

13   back?

14       A.   Correct.

15       Q.   Okay.  And that, again, is something that

16   you've done to the original financial statements

17   that did not appear on the financial statements,

18   right?

19       A.   Well, it appeared as a footnote in the

20   financial statement.

21       Q.   Correct, but the treatment that you're

22   giving it here in footnote D and in this schedule

23   by adding it back is something that was not done in

24   the original financial statements, correct?

1      A.   That is correct.

2      Q.   And you've done that for what reason, to

3   more properly reflect where the loss should be --

4   or excuse me, where the expense should be recorded?

5      A.   We've -- as stated in footnote D, we've

6   done -- we have added it back because in our

7   judgment, it does not meet the high -- it does not

8   meet the definition and standard for a liability to

9   be included in a financial statement.

10     Q.   And so you've added it back to more properly

11  reflect the financial condition of the company,

12  correct?

13              MR. ROSENBERG:  Object to the form.

14              THE WITNESS:  We've added it back to

15  include it in the financial statements for the

16  company.  In our -- in my opinion, it should have

17  been a footnote disclosure only.

18  BY MR. BENAK:

19     Q.   And so in your opinion, the financial

20  statements are more accurate as you've treated them

21  than they would be as they were treated in the

22  original financial statements, correct?

23     A.   With the -- in my opinion, the add back is

24  appropriate.  If you're -- if you're asking me if

1    $150,000 is a material misstatement that requires an

2    add back, I don't know.  I'd need far more

3    information to make that judgment.

4        Q.  Okay.  But you've added it back because in

5    your judgment it makes the financial statements

6    more accurate?

7        A.  Yes.

8        Q.  Okay.  And that add back increases the

9    performance incentive due to ForteONE under the

10   agreement, is that correct?

11       A.  That is correct.

12           MR. BENAK:  Give us a couple of

13   minutes, Mr. Rosenberg.

14           MR. ROSENBERG:  Okay.

15           (Recess was taken from 12:43 to 12:47.)

16           MR. BENAK:  Back on the record.

17           Thank you, Mr. Conrad.  We have no

18   further questions.

19           MR. ROSENBERG:  I have no questions.

20   We'll reserve signature.

21           MR. BENAK:  Good.  Thanks for coming

22   down, guys.

23           THE REPORTER:  Do you want it

24   transcribed?

1                MR. BENAK:  Yes.

2                THE REPORTER:  Do you want a copy?

3                MR. ROSENBERG:  I'll have a copy, a

4    mini e-tran, please.

5                (Deposition concluded at 12:47.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT L**

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION
 3
           ForteCEO Services, Inc., d/b/a ForteONE,
 4                           vs.
              Terra Contracting, LLC, et al.
 5
                        1:11-CV-05179
 6
 7
 8              I hereby certify that I have read the
 9    foregoing transcript of my deposition, given on August
10    29, 2013, consisting of pages      through    ,
11    inclusive, and I do again subscribe and make oath that
12    the same is a true, correct and complete transcript of
13    my deposition so given as aforesaid, as it now appears.
14
15              Please check one:
16                      I have no corrections
17                      Number of errata sheets
                        enclosed
18
19    (signed)
                JEFFREY T. CONRAD, CPA, JD
20

      SUBSCRIBED AND SWORN TO
21    before me this      day
      of          , A.D., 2013.
22
23      NOTARY PUBLIC
24
```

**EXHIBIT L**

1                    CERTIFICATE

2                        OF

3           CERTIFIED SHORTHAND REPORTER

4

5           I, KARYN H. CHALEM, a Certified Shorthand

6   Reporter of the State of Illinois, CSR License No.

7   084-004167, do hereby certify:

8           That previous to the commencement of the

9   examination of the aforesaid witness, the witness was

10  duly sworn by me to testify the whole truth concerning

11  the matters herein;

12          That the foregoing deposition transcript was

13  stenographically reported by me and was thereafter

14  reduced to typewriting under my personal direction and

15  constitutes a true and accurate record of the testimony

16  given and the proceedings had at the aforesaid

17  deposition;

18          That the said deposition was taken before me

19  at the time and place specified;

20          That I am not a relative or employee or

21  attorney or counsel for any of the parties herein, nor a

22  relative or employee of such attorney or counsel for any

23  of the parties hereto, nor am I interested directly or

24

**EXHIBIT L**

1    indirectly in the outcome of this action.

2              IN WITNESS WHEREOF, I do hereunto set my

3    hand at Chicago, Illinois, this 9th day of September,

4    2013.

5

6

7

8

9              KARYN CHALEM, CSR, RPR

               CSR No:  084-004167

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT L**